IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ANIBAL ALEJANDRO HERNANDEZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:19-CV-123-O |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Anibal Alejandro Hernandez, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice, against Lorie Davis, director of that division, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I. BACKGROUND

In 2013 Petitioner was indicted in Tarrant County, Texas, Case No. 1341966D, with capital murder in the shooting deaths of Mark Anthony Torres and Aracely Charles in Arlington, Texas. Clerk's R. 6, ECF No. 18-15. On April 1, 2015, a jury found him guilty as charged and, the state having waived the death penalty, the trial court sentenced him to life imprisonment without parole. *Id.* at 130, 135. Petitioner's conviction was affirmed on appeal, and the Texas Court of Criminal Appeals refused his petition for discretionary review. Docket Sheet 1-2, ECF No. 18-2. Petitioner also challenged his conviction in a state habeas-corpus application, which the Texas Court of

Criminal Appeals denied without written order. SHR[1] & Action Taken, ECF Nos. 18-24 & 18-22.

This federal habeas-corpus petition followed.

The evidence at trial was summarized by the state appellate court as follows:

[Petitioner] sold marijuana and cocaine for Torres out of an apartment. The apartment was referred to as a trap house. [Petitioner] had been living in the trap house for two or three months. Torres and his wife, Charles, lived elsewhere, and normally only Torres would come to the trap house.

On the night of September 6, 2013, [Petitioner] entertained a small group at the trap house. The group consisted of Torres, Charles, Miguel Trevino, Carlos De Jesus, Victoria Tijerina, and [Petitioner]. Zulema Reta and Anna Esparza arrived to join the gathering around 3:00 a.m. on September 7, 2013.

Uninvited, a number of [Petitioner]'s teenage friends arrived at the party as well. One of them explained that they had been at another party, but a fight had broken out and the police came, "so [they] had to find somewhere else to go party."

Torres had a policy of not letting anyone he did not know in the trap house. Torres grew incensed when the teenagers did not leave, so he grabbed a pistol, pointed it at the teenagers, and ordered them out. The teenagers left.

Although now free of the teenagers, Torres's anger towards [Petitioner] for letting them into the trap house persisted. Torres was also angry at Trevino because Torres had learned from some of the teenagers that Trevino had given [Petitioner] cocaine after Torres had previously told Trevino that [Petitioner] was not to have any drugs; Torres thought cocaine made [Petitioner] "panic and go crazy."

While Torres berated [Petitioner], [Petitioner], while on his knees, kept his head down and repeated over and over, "Yes, sir." Torres grabbed a pistol and pointed it at [Petitioner]'s head and shouted, "You know I can kill you right now. . . . Both of y'all. . . . I can kill everybody in the apartment." Turning his attention to Trevino, Torres asked [Petitioner] what he should do with him. [Petitioner] responded, "Kill him."

Esparza, seeing Torres pointing the gun at both [Petitioner] and Trevino, acknowledged being "a little bit freaked out." De Jesus, who was also still present, stood beside Torres, kept quiet, and simply looked on. Charles, however, intervened and managed to calm Torres down. When the group informed Torres that everyone,

---

[1]"SHR" refers to the record of Petitioner's state habeas proceeding in WR-89,389-01.

including [Petitioner], was leaving, Torres responded, "Yeah, y'all need to get . . . out of my house."

 [Petitioner], Trevino, De Jesus, Reta, and Esparza then went across the street to Trevino and De Jesus's apartment complex. De Jesus and Esparza thereafter formed one group, and [Petitioner], Trevino, and Reta formed another.

[Petitioner] and Trevino wanted to return to the trap house and "jump" Torres, and one of them made the comment that it was "[k]ill or be killed." Reta tried to discourage [Petitioner] and Trevino from doing anything rash.

De Jesus and Esparza then rejoined [Petitioner], Trevino, and Reta. [Petitioner] and Trevino argued back and forth about who was going to kill Torres. [Petitioner] told Trevino, "No, he pointed at me, so I have to do it. He's disrespecting me." Because Torres had pointed the gun at Trevino as well, Trevino responded, "No, I'll do it because he disrespected me, too." [Petitioner], realizing that Esparza and Reta had overheard their plans, told Trevino that he would have to get rid of Esparza and Reta too, but Trevino nixed that idea.

Both Esparza and Reta tried to discourage [Petitioner] and Trevino from going through with their plans. Esparza explained, "They were all drunk. You could tell they were [on] drugs, so they—they weren't thinking right [about] what they were . . . going to do." Esparza testified that she and Reta tried to tell [Petitioner] "not to do it," and when pressed about what specifically they were trying to tell [Petitioner] not to do, she responded, "To try to kill [Torres] and [Charles]." [Petitioner] and De Jesus bluntly instructed Esparza and Reta that it was time for them to leave, so Esparza and Reta left; it was around 6:00 a.m.

At 6:13 a.m., a 911 dispatcher received a call of shots heard in the area of the trap house. Around 8:00 a.m., a maintenance worker at the apartment complex that included the trap house saw [Petitioner] carrying a television, a laptop, and an electronic game, looking "like he was waiting for somebody." The maintenance worker described [Petitioner]'s arms as being smeared with blood stains; after the maintenance worker chatted with [Petitioner] for several minutes, [Petitioner] walked across the street to another apartment complex. When questioned by detectives, [Petitioner] initially denied but later admitted he was the person the maintenance man had seen.

Around 11:00 a.m., [Petitioner] telephoned Torres's cousin, James Daniel Garza, and repeatedly told him, "They're gone." Garza described [Petitioner]'s voice as "scared." Garza eventually concluded [Petitioner] was referring to Torres, and after calling several family members, he immediately went to the trap house.

Around the same time, [Petitioner] reported to his probation class, and after some prompting, he revealed that he had found two family members shot in the head. [Petitioner] later told the detectives investigating the deaths that he told the probation social worker that he had just come home from a night out at XTC—an exotic dancers' club from [Petitioner]'s description—and found two people dead in his apartment. After some further prompting from the social worker, at 11:44 a.m., [Petitioner] himself made a 911 call.

Around noon, Reta telephoned Esparza to tell her that Torres and Charles had been killed. Esparza's attempts to call Trevino and De Jesus failed; she denied trying to call [Petitioner].

Around 2:00 p.m. that afternoon, [Petitioner] telephoned Esparza and, crying, told her repeatedly, "I did it." Esparza understood [Petitioner] to mean that he had killed Torres and Charles. When Esparza told [Petitioner] not to take the blame if he did not do it, [Petitioner] remained quiet for a couple minutes; he then repeated his refrain, "I did it. I did it." Esparza thought that there was something about [Petitioner]'s voice that suggested someone was forcing him to take the blame. Esparza thought somebody was threatening [Petitioner] and did not believe that [Petitioner] had killed Torres and Charles. When questioned by detectives about this call, [Petitioner] initially denied but later admitted calling Esparza and telling her that he had killed Torres. [Petitioner] maintained, however, that he had told Esparza that to protect her from De Jesus.

Trevino talked with Esparza later that day and encouraged her to lie to the police. Later Trevino and Esparza met, and after an argument, Esparza agreed to place a pistol and some ammunition that he had brought with him in the trunk of her car. Still later that day, De Jesus called Esparza and instructed her to bring the pistol to him. De Jesus and Trevino later claimed that they threw the pistol into a lake.

At the trap house, the police found shotgun waddings and a number of shotgun pellets. Ballistic tests on the wadding and shot indicated that the victims may have been shot with a Taurus Judge revolver loaded with Winchester brand .410 shotgun shells.

When questioned by detectives, [Petitioner] volunteered that De Jesus carried a Judge. [Petitioner] explained to one of the detectives how he had seen De Jesus cleaning a Judge revolver and how he had seen "shotgun bullets."

Torres's autopsy showed that he had been shot twice in the head at close range by a weapon firing shotgun ammunition. The cause of death was multiple gunshot wounds, and the manner of death was homicide, that is, "death at the hands of another person." Charles's autopsy showed that she had been shot once in the

back, once in the chest, and once to the right side of her face by the same type of weapon that had killed Torres. Like her husband, her cause of death was multiple gunshot wounds, and her manner of death was homicide.

During his interviews with detectives, [Petitioner] gave many stories about what had happened that night. One of [Petitioner]'s stories was that he, Trevino, and De Jesus agreed to kill Torres. The three of them went to the trap house together, and De Jesus then entered and shot both Torres and Charles.

Mem. Op. 2-7, ECF No. 18-3.

## II. ISSUES

In five grounds for relief, Petitioner complains of ineffective assistance of counsel and the cumulative effect of counsel's errors. Pet. 6-7(a), ECF No. 1.

## III. RULE 5 STATEMENT

Respondent does not believe that Petitioner's petition is barred by limitations, subject to the successive-petition bar, or unexhausted and procedurally barred. Resp't's Answer 8, ECF No. 16.

## IV. DISCUSSION

### A. Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Further, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* --- U.S. ---, 138 S. Ct. 1188, 1191-92 (2018).

### B. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*. 466 U.S. at 668. To establish ineffective assistance of counsel under this standard, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Id.* Both prongs of the *Strickland* test must be met to demonstrate

ineffective assistance. *Id.* at 687, 697.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record. *Richter,* 562 U.S. at 100-01 (quoting *Williams,* 529 U.S. at 410)); *Bell v. Cone,* 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Under grounds one through four, Petitioner claims that trial counsel rendered ineffective assistance because counsel

> (1)    failed to object to the magistrate judge's order to shackle Petitioner throughout his trial without stating any specific reason other than general courtroom security;
>
> (2)    failed to move to suppress Petitioner's statements to police obtained in violation of his right to counsel;
>
> (3)    argued to the jury during closing argument that his defensive theory was "fabricated" and that Petitioner was a "liar" and a "rat"; and
>
> (4)    failed to object to the law-of-parties jury instruction.

Pet. 6-7, ECF No. 1. Under ground five, Petitioner adds a claim that counsel was ineffective because

he failed to adequately investigate juror misconduct and claims that the cumulative effect of counsel's errors deprived him of his right to effective assistance of counsel. *Id.* at 7(a); Pet'r's Mem. 1-12, ECF No. 10.

Petitioner raised his claims in his state habeas-corpus application, which the trial court referred to a magistrate judge for findings and conclusions of law. SHR 102, ECF No. 18-24. Toward that end, the magistrate judge ordered Petitioner's trial counsel to respond to Petitioner's claims by affidavit. Counsel filed an affidavit in which he responded to Petitioner's allegations as follows: (all spelling, grammatical, and punctuation errors are in the original):

> **GROUND ONE: [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO [PETITIONER] BEING SHACKLED DURING HIS ENTIRE TRIAL WITHOUT JUST CAUSE.**
>
> On December 23, 2013 I filed a Motion for Defendant to Appear in Personal Clothing and without restraints. This motion was granted in part on March 23, 2015 with provision that "leg shackles not be visible to the jury at any time". This method of court room security is standard in Tarrant County and has been for over 20 years. [Petitioner] was escorted to and from the courtroom outside of the view of jurors and seated at a skirted counsel tale which hid his restraints from view by jurors. This procedure was followed from voir dire until the end of trial. Petitioner's assertion in the ground is erroneous.
>
> **GROUND TWO: [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCEOF COUNSEL BY TRIAL COUNSEL'S FAILURE TO FILE A MOTION TO SUPRESS [PETITIONER]'S STATEMENTS TO POLICE OBTAIED IN VIOLA TON OF [PETITIONER]'S RIGHT TO COUNSEL.**
>
> I meticulously reviewed over five hours of recorded interviews of [Petitioner] by the case detective and other police officers investigating the offense. Preceding each interview [Petitioner] was advised of his legal rights. Although [Petitioner] was reluctant and resistant to questioning he continued to talk to is [sic] interviewers. Weather or not his interviews were all custodial is not an issue. As he made an effective waiver of his right to counsel and his right to remain silent [Petitioner] continued to explain his involvement and respond to questions even after stating that he wanted a lawyer and wanted to leave. I found no legal grounds to support a motion

to suppress based on what I observed in the recorded interviews.

I did not request a jury instruction on illegally obtained evidence because the recorded interviews of [Petitioner] were all published to the jury during trial. I felt the jurors could judge [Petitioner]'s statements, in those interviews, based on a totality of the circumstances.

### GROUND THREE: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL DURING HIS CLOSING ARGUMENT.

The only defensive theory of this case was that the evidence presented, and focused on by the State, could just as easily prove alternative events. [Petitioner]'s version of the offense was constantly changing during police interviews, as well as my conversations with him throughout the course of representation. Given that the evidence was just as applicable to prove another version of events, then it followed that said evidence was insufficient to prove [Petitioner]'s guilt beyond a reasonable doubt. Due to multiple contradictions in [Petitioner]'s statements, I compiled a version of events that showed [Petitioner] in the least culpable light. I remain convinced that Detective Stuart conducted a conclusory investigation of the case. I started presenting this defense in voir dire, using the example of viewing the picture of a jigsaw puzzle and making the pieces form the image; rather than fitting the pieces together to form an unknow image. I used a puzzle contained in a brown paper bag as a prop. I referred to liars and rats during voir dire and during closing to show why a witness might lie on the stand. I do not recall directly referring to [Petitioner] as a liar or a rat.

Cross examination of Detective Stuart took several hours, as I laid out an alternative theory of the offense and linked his evidence to that theory. In the end, Detective Stuart admitted that the evidence could not disprove my alternate theory any more than it supported his. Detective Stuart testified that he "believed" his version of the crime was correct.

I find it ironic that [Petitioner] now adopts a defensive theory that he did not provide or agree to prior to trial.

### GROUND FOUR: [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNCELS FAILURE TO OBJECT BASED ON JURY TRIAL ERROR.

I saw no legal objection to exclusion of a jury instruction on the Law of Parties, in fact I thought it was advantageous not to give the jury more than one way to convict [Petitioner]; State's argument notwithstanding.

**GROUND FIVE: TRIAL COUNSEL FAILED TO INVESTIGATE JURROR MISCONDUCT DURING THE VOIR DIRE WHEN IT CAME TO LIGHT THAT VENIRE WOMAN WHOM HAD BEEN DISMISSED LATER TEXTED [PETITIONER]'S "MUGSHOT" TO AT LEAST ONE MEMBER OF THE PETIT JURY. TRIAL FAILED TO CONDUCT ANY SUBSEQUENT INQUIRY TO DETERMINE IF OTHER MEMBERS OF THE PETIT JURY HAD ALSO RECEIVED THE TEXT OF [PETITIONER]'S MUG SHOT FROM THE DISMISSED BERNIRE [sic] WOMAN. LINKS TO STORIES ABOUT [PETITIONER]'S CASE WERE ATTACHED TO THE TEXT OF [PETITIONER'S] MUGSHOT.**

The improper communication stated in the Ground Five was self-reported by a jury panelist prior to spending [sic] statements. An inquiry was conducted by the Trial Judge who reported to State and Defense that no other panelist was involved. State and Defense counsel both questioned the panelist as to possible bias because of the communication and the trial judge made the finding that she was still qualified to serve.

Cumulative effects of errors addressed above.

*Id.* at 40-42 (citations omitted).

Based on counsel's affidavit and the documentary record, the magistrate judge entered the following factual findings (all spelling, grammatical, and/or punctuation errors are in the original):

*Shackles*

6.  On December 23, 2013 Trial Counsel filed a motion for [Petitioner] to appear in personal clothing and without restraints, asserting that appearing in court wearing shackles would subject [Petitioner] to unfair prejudice and infringe upon the presumption of innocence.

7.  The motion for [Petitioner] to appear in personal clothing and without restraints was heard on March 23, 2015.

8.  Trial Counsel's motion for [Petitioner] to appear in personal clothing and without restraints was granted in part on March 23, 2015 with the provision that "leg shackles not be visible to the jury at any time."

9.  [Petitioner] was escorted to and from the courtroom outside of the view of jurors and seated at a skirted counsel table which hid his restraints from view by jurors.

10

10.    This procedure was followed from voir dire until the end of trial.

11.    [Petitioner] presents no evidence that the jury was aware of the shackles.

12.    [Petitioner] did not complain about his shackling on direct appeal.

13.    There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different if Trial Counsel had also objected to the shackles after the trial court made its ruling.

*Motion to Suppress*

*The First Interview*

14.    The police first interviewed [Petitioner] on September 7, 2013.

15.    Regarding the first interview, the supplemental police report reads, in part:

Before going to the offense location at 2111 Madison Drive in the city of Arlington Texas, I spoke with Sgt. Martha Woody by phone and she informed me that she was with a person who said he was at the offense location and saw both victims in the apartment deceased. Sgt. Woody identified the person to be [Petitioner] and she said [Petitioner] was actually at an Anger Management class that is mandated as part of his condition being on probation. Sgt. Woody said [Petitioner] told a counselor in his class what he saw at the Stone Canyon Apartments and the counselor instructed him to call the Arlington Police Department. I asked Sgt. Woody if she would ask [Petitioner] to come to the Arlington Police Station located at 620 W. Division Street in order for me to speak with him about the offense in greater detail. Sgt. Woody said [Petitioner] did agree to come to the Arlington Police Department however, he did not have transportation. Sgt. Woody made arrangements with an on duty Arlington Officer to drive [Petitioner] to the Arlington Police Department to speak in more detail about what happen up to the point where he found the victim's deceased.

. . .

I questioned [Petitioner] about the deaths of both victims and [Petitioner] denied having any knowledge about what led to their deaths. [Petitioner] went on to tell me that he was at the offense apartment last night on 09/06/2013. He said while he was at the

11

apartment, he was with the victims Mack Torres and Aracely Charles. [Petitioner] said Mack's niece came by the apartment around 11:00pm and he identified her by giving a first name of Victoria. Victoria was fully identified as being Victoria Tijerina, Hispanic female, 02/05/1996. [Petitioner] said Victoria brought a pizza to the residence because she works at Pizza Hut and it is located right around the corner from the offense location.

[Petitioner] said he made plans earlier to go out and he called some friends to come pick him up from the apartment. [Petitioner] said he called a friend by the name of Miguel and Carlos. Miguel was fully identified as being Miguel Trevino, Hispanic male, 09/12/1992 and Juan Carlos De Jesus, Hispanic male, 08/07/1989. [Petitioner] said Miguel, Carlos and him left the offense apartment around 11:30pm and they drove to the city of Fort Worth in order to go to a strip club called XTC. [Petitioner] said when they got to the club, they realized that the club would not let him or Miguel in the club because they were not twenty one years old. [Petitioner] said they decided to drive to the city of Dallas in order to go to another strip club that was also called XTC. [Petitioner] said they were able to get in the club and they stayed in the club until it closed.

After the club closed, [Petitioner] said they met some of the dancers who lived in Arlington and they drove back to the city of Arlington and went to the girl's apartment in East Arlington. [Petitioner] said they left the apartment that Saturday morning on 09/07/2013 and he remembered that he had an Anger Management class that he was required to take as part of his probation condition. [Petitioner] said he needed his folder for the class and he said he left the folder at the offense location which was at 2111 Madison Drive, #1101. [Petitioner] said they drove to the offense location and he knocked on the door to apartment #1101 and did not get an answer. [Petitioner] said he soon realized that the door was slightly open so he walked inside the apartment and upon entry, he could immediately see Mack Torres and Aracely Charles lying on the floor in the living room with blood coming from both bodies. [Petitioner] said he knew they were dead and he said he looked for his folder for his Anger Management class and realized it was also missing from the apartment. [Petitioner] said he backed out of the apartment and closed the door. He said he got back in the car with Miguel Trevino and told him to just take him to his Anger Management class. [Petitioner] said he did not tell anyone in the car what he had just seen in the apartment that Mack Torres and Aracely Charles were seen dead inside the apartment.

[Petitioner] said he did make it to his Anger Management class but he was about fifteen minutes late. He said while he was in the class, he kept thinking about what he saw at the apartment with Mack and Aracely being seen dead in the apartment. [Petitioner] said he managed to pass the counselor a note asking her if he could speak with her in private.

[Petitioner] said once he was able to speak with the counselor, he told her what he saw at the apartment related to Mack Torres and Aracely Charles. He said the counselor advised him to call the police department and he did. This is how [Petitioner] came in contact with Sgt. Woody who went to the center where [Petitioner] was located.

16.    [Petitioner] initiated contact for the first interview.

17.    [Petitioner] agreed to the first interview.

18.    The police gave [Petitioner] a ride to the police station.

19.    [Petitioner] was not handcuffed during the first interview.

20.    [Petitioner] was not a suspect during the first interview.

21.    Detective Stewart testified that [Petitioner] was not under arrest during the first interview.

22.    Detective Stewart testified [Petitioner] was free to leave during the first interview.

23.    There is no evidence that Detective Stewart gave false testimony.

24.    [Petitioner] voluntarily participated in the first interview.

25.    [Petitioner] denied any involvement in the crime during the first interview.

26.    There is no evidence or allegation that probable cause to arrest existed during the first interview.

27.    [Petitioner] concedes that probable cause to arrest did not exist during the first interview.

28.    [Petitioner] freely left when the first interview concluded.

13

29.    [Petitioner] was not in custody during the first interview.

30.    Trial Counsel found no legal grounds to support a motion to suppress the first recorded interview.

*The Second Interview*

31.    The police interviewed [Petitioner] again on September 8, 2013.

32.    Regarding the second interview, the supplemental police report reads, in part:

On 09/08/2013, [Petitioner] came back to the Arlington Police Department and I was able to interview him for a second time. During my second interview with [Petitioner], I informed him of his Miranda Warnings although he was not under arrest at this time. He was informed of his warnings because it was believed at this time that [Petitioner] was possibly involved in the deaths of Mack Torres and Aracely Charles.

During this second interview with [Petitioner], he implicated Juan Carlos De Jesus as the person who shot and killed the victims Mack Torres and Aracely Charles. According to [Petitioner], Juan told him that he shot the victim Mack Torres because they got into an argument over some cocaine that was left inside the residence. [Petitioner] said Juan told him that he also shot Aracely because she was a witness to the shooting. [Petitioner] said after the shooting they drove to Pirie Park in the city of Arlington located at 1016 W. Cedar Street. He said Juan began cleaning the gun that was used in the offense. [Petitioner] described the gun as being a revolver called "The Judge" and he said the gun fires .410 caliber buckshot that resembles shotgun shells. According to [Petitioner], while Juan was cleaning the gun, he dumped the shell casings to the ground at the park. [Petitioner] said as far as he knew, the casings were still on the ground at the park. After my second interview with [Petitioner], he was allowed to leave the police station on his own.

33.    [Petitioner] initiated the second interview.

34.    [Petitioner] was a suspect during the second interview.

35.    Detective Stewart read [Petitioner] his *Miranda* warnings before the second interview.

36.    [Petitioner] concedes that probable cause to arrest did not exist during the second interview.

37.    [Petitioner] does not claim that he asserted any of his rights under *Miranda* during the second interview.

38.    [Petitioner] was not handcuffed during the second interview.

39.    After the second interview, [Petitioner] was allowed to leave.

40.    [Petitioner] was not in custody during the second interview.

*The Third Interview*

41.    Detective Stewart interviewed [Petitioner] again on September 9, 2013.

42.    The police initiated the third interview.

43.    Detective Stewart read [Petitioner] his *Miranda* warning before the third interview.

44.    During the third interview, [Petitioner] confessed to being present during the crime, but he denied being the shooter.

45.    [Petitioner] does not claim that he asserted any of his rights under *Miranda* during the third interview.

46.    According to [Petitioner], probable cause to arrest was established after the third interview.

47.    Detective Stewart arrested [Petitioner] after the third interview.

*Closing argument*

48.    The defensive theory of this case was that, because the evidence on which the State focused could just as easily prove alternative events, it was insufficient to prove [Petitioner]'s guilt beyond a reasonable doubt.

49.    [Petitioner] gave several different versions of the facts of the offense to the police and trial counsel.

50.    Due to multiple contradictions in [Petitioner]'s statements, Trial Counsel compiled a version of events that showed [Petitioner] in the least culpable

light.

51.    During cross examination of Detective Stewart, Trial Counsel laid out an alternative theory of the offense and linked his evidence to that theory.

52.    Though Detective Stewart testified that he "believed" his version of the crime was correct, he admitted that the evidence could not disprove Trial Counsel's alternate theory.

53.    [Petitioner] confessed to the crime to Detective Stewart.

54.    Trial Counsel's reference to [Petitioner] as a liar and a rat, when read in context of his closing argument, was an attempt to create reasonable doubt regarding the credibility of [Petitioner]'s confession.

*Jury Charge*

55.    Trial Counsel did not request a jury instruction on the Law of Parties.

56.    Trial Counsel felt it was advantageous not to give the jury more than one way to convict [Petitioner].

57.    There is no evidence that [Petitioner] was harmed by Trial Counsel's failure to request an instruction on the Law of Parties.

*Juror Misconduct*

58.    Prior to opening statements, a jury member self-reported the following:

> [L]ast night [a member of the jury panel not seated on the jury]sent me a text with [Petitioner]'s mug shot and she had a link on there. I didn't look at the link, but -- but I saw the picture. And -- and this morning, you know, I talked to my -- well, I talked to my husband. He said, Tell her don't send you anymore information and I said that, you know, and she sent me back something about, I will pray for you, or something like that.

59.    The trial court conducted an inquiry regarding the improper communication.

60.    Defense counsel questioned the juror regarding whether the communication affected the presumption of innocence and the State's burden of proof.

61.    The jury member stated on the record that the information she received would

not affect her ability to honor the presumption of innocence or hold the State to its burden of proof.

62.    The trial court found the reporting panelist fit to serve on the jury.

63.    There is no evidence that [Petitioner] was harmed by Trial Counsel's failure to challenge the trial court's ruling.

SHR 109-17, 140, ECF No. 18-24 (citations omitted).

Based on these findings, and applying the *Strickland* standard, the magistrate judge entered

the following legal conclusions:

*Shackles*

9.    Trial Counsel's presentment of his motion for [Petitioner] to appear in personal clothing and without restraints to the trial court preserved [Petitioner]'s shackling for appellate review.

10.    Nothing in the record reflects that any member of the jury actually saw or noticed that [Petitioner] was shackled.

11.    Nothing in the record establishes a reasonable probability that [Petitioner]'s shackles deprived him of the presumption of innocence, interfered with his ability to communicate with counsel, or undermined the dignity of the judicial process.

12.    Nothing in the record shows that the restraints interfered with his ability to communicate with counsel trial.

13.    [Petitioner] has failed to prove that Counsel's failure lodge another objection to the use of shackles fell below the wide range of reasonable professional assistance.

14.    [Petitioner] has failed to prove there is a reasonable probability the results of the proceedings would have been different had Trial Counsel lodged another objection to the use of shackles.

15.    [Petitioner] has failed to show that Counsel provided ineffective assistance by failing to lodge another objection to the use of shackles.

. . .

17

*Motion to Suppress*

17.    A person in custody has a right to remain silent and a right to counsel during questioning.

18.    Miranda procedural safeguards apply only to custodial interrogations.

19.    [Petitioner] was not in custody during the first interview.

20.    Because the first interview was noncustodial, [Petitioner]'s Fifth Amendment protections were not implicated.

21.    Because the first interview was noncustodial, [Petitioner]'s Sixth Amendment right to counsel was not implicated.

22.    Because the first interview was noncustodial, *Miranda* warnings were not necessary.

23.    [Petitioner] has failed to prove the recording of the first interview was inadmissible.

24.    A defendant waives his *Miranda* rights when he initiates communication with the police.

25.    [Petitioner] waived his rights under *Miranda* by initiating the second interview.

26.    [Petitioner] has failed to prove the recording of the second interview was inadmissible.

27.    [Petitioner] has failed to prove the recording of the third interview was inadmissible.

28.    Assistance of counsel is not rendered ineffective for failing to make a frivolous request which the court would properly have refused.

29.    [Petitioner] has failed to show that he would have prevailed had Trial Counsel filed a motion to suppress the first interview.

30.    [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel moved to suppress the first interview.

31.     [Petitioner] has failed to show that he would have prevailed had Trial Counsel filed a motion to suppress the second interview.

32.     [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel moved to suppress the second interview.

33.     [Petitioner] has failed to show that he would have prevailed had Trial Counsel filed a motion to suppress the third interview.

34.     [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel moved to suppress the third interview.

35.     [Petitioner] has failed to overcome the presumption that counsel's failure to file a motion to suppress the complained-of interviews fell below the wide range of reasonable professional assistance.

36.     "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

37.     [Petitioner] has failed to show the requisite prejudice in Counsel's failure to file a motion to suppress the complained-of interviews.

38.     [Petitioner] has failed to show that Counsel provided ineffective assistance by failing to file a motion to suppress the complained-of interviews.

        . . .

*Closing Argument*

40.     Trial Counsel's attempt to create reasonable doubt regarding [Petitioner]'s confession was the result of reasonable trial strategy.

41.     [Petitioner] has failed to show that Counsel's closing argument fell below the wide range of reasonable professional assistance.

42.     [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had Counsel argued differently.

        . . .

44.    [Petitioner] has failed to show the requisite prejudice in Counsel's argument.

45.    [Petitioner] has failed to show that Counsel provided ineffective assistance through his closing argument.

*Jury Charge*

47.    Counsel's attempt to limit the theories under which the jury could convict [Petitioner] was the result of reasonable trial strategy regarding [Petitioner]'s confession.

48.    [Petitioner] has failed to show that Counsel's failure to request an instruction on the law of parties fell below the wide range of reasonable professional assistance.

49.    [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel requested an instruction on the law of parties.

        . . .

52.    [Petitioner] has failed to show that Counsel provided ineffective assistance.

*Alleged Juror Misconduct*

        . . .

55.    [Petitioner] has failed to show the requisite prejudice in Counsel's failure to challenge the trial court's ruling regarding the juror who was sent [Petitioner]'s mug shot.

56.    [Petitioner] has failed to show that Counsel's acceptance of the trial court's ruling regarding the complained-of juror fell below the wide range of reasonable professional assistance.

57.    [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had Counsel challenged the trial court's ruling.

58.    [Petitioner] has failed to show that Counsel provided ineffective assistance.

*Id.* at 119-24 (citations omitted).

The magistrate judge's findings and conclusions were subsequently adopted by the trial judge who had presided over the trial proceedings. *Id.* at 141. Save for ground four, Petitioner presents no evidence or persuasive argument to rebut the state court's findings and conclusions. Therefore, relying on the presumptive correctness of those findings, and having independently reviewed Petitioner's ineffective-assistance-of-trial-counsel claims in conjunction with the state court records, the state court's application of *Strickland* was not objectively unreasonable under the doubly-deferential standard applied to such claims. Petitioner's claims are conclusory, with no legal and/or evidentiary basis, involve strategic and tactical decisions made by counsel, or would have required counsel to make frivolous requests, motions, or objections, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Yarborough v. Gentry,* 540 U.S. 1, 9 (2003) (providing "[b]y candidly acknowledging his client's shortcomings [during closing argument], counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case"); *Strickland,* 460 U.S. at 689 (providing strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (providing counsel is not required to make futile motions or frivolous objections); *Green v. Johnson,* 160 F.3d 1029, 1037, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"); *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995) ( providing counsel's actions during voir dire are considered to be a matter of trial strategy).

As to ground four, the state habeas court and trial counsel appear to misinterpret the claim. Petitioner does not complain of the exclusion of an instruction on the Texas law of parties, he

complains of counsel's failure to object to *inclusion* of the instruction in the jury charge because the "charge failed to name any party for whose behavior [he] could be held responsible for." Pet'r's Mem. 10, ECF No. 21.

In this case, the jury was charged in accordance with Texas Penal Code §§ 7.01 and 7.02 as follows:

> You are instructed that an "accomplice," as the term is here used, means anyone connected with the crime charged as a party to the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, or aids or attempts to aid the other person to commit the offense.
>
> Mere present alone, however, will not constitute one a party to an offense.
>
> . . .
>
> Now, if you find from the evidence beyond a reasonable doubt that on or about the 7th day of September, 2013, in Tarrant County, Texas, [Petitioner], *either acting alone or as a party,* did then and there intentionally or knowingly cause the death of an individual, Mark Anthony Torres, by shooting him with a deadly weapon, to wit: a firearm, and did then and there intentionally or knowingly cause the death of an individual, Aracely Charles, by shooting her with a deadly weapon, to wit: a firearm, and both murders were committed during the same criminal transaction, then you will find [Petitioner] guilty of capital murder as charged in the indictment.

SHR 46, ECF No. 18-24 (emphasis added).

Petitioner asserts that the evidence was insufficient to convict him as the primary actor and that the state erroneously argued during closing argument that he "could be convicted under the law of parties for the conduct of Carlos De Jesus, even though Detective Stewart testified that there was no evidence that Carlos was a party to the offense." Pet'r's Mem. 10, ECF No. 10. Petitioner argues that "in order to convict [him] under the law of parties, the jury charge should have included the

name(s) of another 'specified person' for whose conduct [he] could be held liable . . . ." *Id.* However, as a matter of Texas law, a general reference to the law of parties in the application paragraph is sufficient. *See Vasquez v. State,* 389 S.W.3d 361, 368 (Tex. Crim. App. 2012).[2] Indeed, the Texas Court of Criminal Appeals has held that an identical instruction in the application paragraph is proper. *See id.*; *Chatman v. State,* 846 S.W.2d 329, 332 (Tex. Crim. App. 1993). And, the Texas Court of Criminal Appeals denied Petitioner's state habeas application without written order. Thus, as a matter of state law, this Court may assume that the charge as submitted properly applied the law of parties to the facts of the case. Counsel is not required to make frivolous objections. *See Johnson,* 306 F.3d at 255.

Finally, because Petitioner fails to establish separate acts of deficient performance, it necessarily follows that relief is not warranted under a cumulative *Strickland* analysis.

## V. Conclusion

For the reasons discussed, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. A certificate of appealability is also DENIED.

**SO ORDERED** on this 5th day of March, 2020.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[2]Petitioner relies wholly on the decision in *Vasquez* in support of his argument. However, in that case the Texas Court of Criminal Appeals merely assumed, without deciding, "that it was error to fail to list the names of the two actual robbers in the application paragraph and to cut and paste the abstract definition of the law of parties into the application paragraph." *Id.* at 370.

23